S98A1938. BOARD OF COMMISSIONERS et al. v. LEVETAN et al.

(512 SE2d 627)

FLETCHER, Presiding Justice.

This case arises out of a dispute among DeKalb County's elected officials. Liane Levetan, chief executive officer of DeKalb County, brought this declaratory judgment action against the county's board of commissioners to determine the validity of two ordinances adopted by the commission over Levetan's veto. The trial court invalidated the ordinances, holding that they improperly shift executive and administrative powers to the commission in violation of DeKalb County's Organizational Act.[1] Because the budgeting ordinance is, in part, a legitimate exercise of the commission's authority under the organizational act, we reverse in part and affirm in part.

The two ordinances relate to the anticipated tax revenues available for capital outlays as a result of the Homestead Option Sales and Use Tax ("HOST").[2] The first ordinance requires the county to retain a program manager to oversee and provide construction management for the projects funded by HOST. The second ordinance details procedures for the commission to follow in appropriating HOST funds.

### THE ORGANIZATIONAL ACT

DeKalb County's Organizational Act specifically delineates the powers of the commission and the chief executive officer. A reading of the act as a whole demonstrates that the CEO and commission are not equals in the running of county government; rather, the act conveys a limited grant of power to the commission while bestowing on the CEO broad executive and administrative powers. Section 9 of the act provides that the commission has power only over those matters "reserved to its jurisdiction." These matters are expressly enumer-

---

[1] 1981 Ga. Laws 640, p. 4304 (hereafter, "organizational act").

[2] See OCGA § 48-8-100 et seq.

ated in section 9. Furthermore, in the areas of its jurisdiction, the commission may only exercise those powers "which are necessarily and properly incident to its functions as a policy-making or rule-making body or which are necessary to compel enforcement of its adopted resolutions or ordinances."[3] The act expressly gives the commission the power to make appropriations and to determine the priority of capital improvements.[4] However, once the commission approves appropriations, the act provides that it is the task of the CEO to enforce the requirement that county funds be spent only in accordance with the approved budget.[5]

In contrast to the limiting language of section 9, section 13 expansively defines the CEO's authority. The CEO, unlike the commissioners, may not have other sources of employment and is required to devote full time to the duties of the office.[6] The CEO "shall have exclusive power to supervise, direct and control the administration of the county government."[7] Section 13 (a) also sets the lines of authority between the commission and the CEO by specifying that the commission "shall deal solely through the chief executive . . . in all matters concerning the operation, supervision, and administration of the various departments, offices, and agencies of the county government." Section 13 (a) further circumscribes the commissioner's powers by prohibiting them from directly or indirectly attempting to control the actions of county personnel. Finally, any confusion about the balance of power between the CEO and commission is settled by section 23, which states that "[n]o power or combination of powers vested in the commission by section 9 or any other provision of this act may be exercised in any manner to amend, change, supersede, or repeal directly or indirectly, any powers vested in the chief executive by this act."

## THE PROGRAM MANAGER ORDINANCE

Ordinance 98-06 requires the county to retain a program manager and sets out the program manager's duties. These duties include construction management of all phases of the HOST projects, ensuring their efficient and timely execution, and evaluating related requests for proposals. The ordinance also requires the program manager to issue quarterly written reports to the CEO and commission on the progress of all ongoing and proposed HOST projects.

---

[3] Organizational Act, § 9 (a).
[4] Id., § 9 (a) (2), (14).
[5] Id., § 17.
[6] Id., § 13 (k).
[7] Id., § 13 (a).

By requiring the hiring of a program manager with broad supervisory power over all phases of the HOST projects, the commission is supplanting the CEO's day-to-day responsibilities in supervising county personnel. The organizational act does not authorize the commission to manage county personnel. Without that direct authority, section 23 of the act precludes the commission from indirectly usurping the CEO's executive and administrative responsibilities by placing them in a program manager. Because the organizational act vests exclusive control of the county's day-to-day management in the CEO, the commission lacks the power to require the retention of a program manager to oversee all HOST projects.

In justifying the adoption of this ordinance, the commission points to concerns about the internal resources of the county to supervise the HOST projects, the efficiency and competency with which the HOST projects will be undertaken, and the management of the substantial sums expected to be generated under HOST. Certainly no one can quibble with these laudable goals to assure the appropriate use of public funds and, given the sums of money expected under HOST and the broad powers of the CEO, the commission's desire for a fiscal watchdog is understandable. However, in addressing these concerns the commission went beyond an expression of its policy judgment that a program manager would better ensure the efficient use of county revenue. The commission's remedies against inefficient and incompetent management are found in section 10 of the organizational act, which authorizes the commission to hire its own internal auditor, and in section 9, which permits the commission to deny approval to any appropriations that will, in its policy judgment, result in waste and inefficiency.

## HOST BUDGETING ORDINANCE

Ordinance 98-07 details the process by which the commission will appropriate HOST funds and determine the priority of capital projects funded by HOST. Specifically, the budgeting ordinance requires that the CEO provide the commission with annual written reports on proposed and pending HOST projects and requires public hearings on, and commission approval of, the proposed HOST projects.[8] It also requires that the CEO separately delineate in the budget HOST funds collected and allocated,[9] submit requests for proposals and requests for additional funding to the commission for approval before release,[10] and attend quarterly retreats with the

---

[8] Ordinance 98-07, §§ 2, 3, 4, 9, and 10.
[9] Id. at § 16.
[10] Id. at §§ 14, 15.

commission to discuss the HOST projects.[11] The ordinance also permits individual commissioners to hold hearings to receive public comments on proposed HOST projects.[12] Once the commission approves HOST projects, the ordinance specifies the procedures for amendments to any project and for appropriations during the various phases of each project.[13] Finally, the CEO is directed to execute the projects.[14]

The CEO contends that the commission's procedures for consideration and approval of HOST projects impermissibly alter the budget process as set out in the organizational act. The direction regarding the budget process in the organizational act is found in section 17. That section specifies that the CEO shall submit a proposed budget to the commission no later than December 15 for the upcoming calendar year. The budget "shall be accompanied by a report containing information and data relating to the financial affairs of the county pertinent to arriving at and establishing the annual budget." The commission then has until March 1 to amend the budget as it deems necessary and to finally approve it.

The budgeting ordinance does not amend these dates nor does it change the obligation of the CEO to submit a proposed budget. Rather, the ordinance works within the time frame established by the act by providing that the commission shall approve the annual HOST projects by March 1, when it must also approve the budget. The ordinance's requirement that the CEO submit financial reports on HOST projects throughout the year is a power expressly given to the commission in section 13 (i), which provides that the CEO "shall also make financial reports during the year as may be required by the commission." Additionally, the requirements for amendments and appropriations are directed toward the commission itself and are expressly authorized by section 9 (a) (19) of the organizational act, which permits the commission to set its own operating rules and regulations. Finally, the requirement that the CEO execute the HOST projects in accordance with the priority set by the commission is duplicative of the organizational act, which states that the CEO "shall carry out, execute, and enforce all ordinances" and provides that the CEO shall enforce budgetary compliance by county departments.[15] Therefore, the procedures set forth in the ordinance for the consideration and approval of HOST projects are a valid exercise of the commission's authority under the organizational act.

---

[11] Id. at §§ 5, 6, and 7.
[12] Id. at § 8.
[13] Id. at § 3.
[14] Id. at §§ 11, 12.
[15] Id. at §§ 13 (a), 17.

Because the organizational act provides that the commission shall authorize contracts over $12,500, the CEO contends that the ordinance is invalid in requiring commission approval of all HOST projects regardless of amount. The plain language of the budgeting ordinance, however, addresses only the commission's specific authority to approve appropriations and does not require commission approval of specific contracts. Because the organizational act expressly places the sole authority to make appropriations and to determine the priority of all capital improvements in the commission, these provisions within the budgeting ordinance are valid. When HOST appropriations result in contracts over $12,500, the commission will have the additional responsibility under section 18 (b) of the organizational act to authorize those contracts, but if a HOST appropriation results in no contract or in a contract for less than $12,500, no such approval will be required.

Sections 14 and 15 of the budgeting ordinance require the CEO to seek commission approval before requesting additional funding and services, such as matching federal funds, and before releasing requests for proposals, invitations to bid, or other solicitations for HOST projects. There is no doubt that the commission has the authority to review such requests under section 13 of the organizational act;[16] however, the power to approve the requests is not inherent in the commission's authority to approve final contracts or appropriations. Additionally, section 18 of the organizational act provides that the CEO "shall establish rules to regulate purchasing" for the county. The efficiency of government may be harmed if the CEO fails to seek commission input in requests for proposals that will ultimately result in contracts that are subject to commission approval or fails to present the commission with requests for funding that, if successful, will require commission approval before appropriated. Nevertheless, if the parties are unable to work cooperatively, as in this case, the express provisions of the organizational act must control. Because the requirement that the commission approve requests for proposals and requests for additional funding and services is in conflict with the act, it cannot stand.

The ordinance also requires that the commission and the CEO "shall together" hold quarterly meetings to consider HOST projects. While the commission is clearly authorized to set its own meetings, the direction to the CEO to attend meetings stands on a different footing. Section 11 of the organizational act gives the CEO the "discretion" to preside at any regular or specially called commission

---

[16] Id. at § 13 (a) ("Nothing herein shall be construed to preclude any commissioner from seeking information necessary to the establishment of policy from any person.").

meeting. Furthermore, the act gives the CEO subpoena power to compel commissioners' attendance at meetings.[17] Absent from the act is the corresponding power of the commissioners to compel the CEO's attendance. Therefore, we conclude that the ordinance is invalid to the extent that it purports to require the CEO to attend any of the public meetings or retreats.

The requirements that the CEO seek commission approval before soliciting funds or releasing requests for proposals and that the CEO attend certain commission meetings are not essential to the purpose or meaning of the ordinance and therefore are severable under the express terms of section 18 of the budgeting ordinance.

## OPEN MEETINGS ACT

Ken Davis, who was the sole commissioner to vote against both ordinances, contends that the ordinances are invalid because some members of the commission violated the Open Meetings Act[18] in discussing the ordinances in closed meetings with counsel prior to their adoption. The Open Meetings Act contains no provision authorizing a court to invalidate an ordinance on the ground that the subject matter of the ordinance was previously discussed at meetings that violate the act. OCGA § 50-14-1 (b) does provide that any official action taken at a meeting held in violation of the act "shall not be binding." However, this provision is inapplicable in this case because the record is clear that both ordinances were adopted at meetings held in compliance with the Open Meetings Act. Because the challenged violation is insufficient to warrant invalidating the ordinances and Davis seeks no other relief, we need not consider whether the earlier meetings violated the Open Meetings Act.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED FEBRUARY 22, 1999.

*Bondurant, Mixson & Elmore, Emmet J. Bondurant, Randi E. Schnell, Jule C. Lassiter,* for appellants.

*Kilpatrick Stockton, Susan A. Cahoon, Cofer, Beauchamp, Stradley & Hicks, W. Burrell Ellis, Jr.,* for appellees.

*Richard D. Barksdale,* amicus curiae.

---

[17] Id. § 13 (f).

[18] OCGA § 50-14-1 et seq.